**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JOSEPH MEYERS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil No. 11-182 Erie** |
| ) | |
| **PENN NORTH CENTERS FOR** ) | |
| **ADVANCED WOUND CARE, P.C.,** ) | |
| **SERENA GROUP, INC.,** *substituted for* ) | |
| *SERENA GROUP, LLC***, and THOMAS** ) | |
| **SERENA,** ) | |
| ) | |
| **Defendants.** ) | |

## <u>Opinion</u>

Plaintiff Joseph Meyers worked for Defendant Dr. Thomas Serena and his companies from July 28 2006, until he was terminated on September 11, 2009. Mr. Meyers filed this action seeking payment for unpaid wages for 2008, vacation pay for 2008 and 2009, and unpaid expenses for 2008 and 2009. Defendants admit that Meyers was not paid wages for three pay periods in 2008, but explain that the company never had sufficient funds to pay the wages and thus the wages are not actually owed. Defendants deny that Meyers is due any vacation pay. Finally, Defendants claim they paid Meyers all expenses he was due, and in fact have overpaid him, for which Defendants seek reimbursement.

A bench trial in this matter was held on August 14 and August 15, 2013. The parties submitted proposed findings of fact and conclusions of law, and this matter is now ripe for resolution. For the reasons that follow we conclude that Meyers is owed wages for three pay periods in 2008, but that he is not due vacation pay or reimbursement for unpaid expenses. In addition, we conclude that Meyers was overpaid for his expenses, which will be set-off against

his award for unpaid wages. We will also dismiss Cynthia Serena as a Defendant and grant Plaintiff's oral motion made at trial to conform the pleadings to the proof. As a result, "Serena Group, Inc." is substituted for Defendant "Serena Group, LLC."

## I.      Factual Findings

Defendant Thomas Serena, M.D., is a board certified physician who specializes in the areas of wound care and hyperbaric medicine. Defendant Penn North Centers for Advanced Wound Care, P.C. {"Penn North") is a professional corporation founded and solely owned by Dr. Serena. Dr. Serena founded Penn North to open and operate wound care and hyperbaric centers and to conduct research on wound care. The wound care centers are clinics that care for patients with difficult to heal wounds. Hyperbaric medicine is a specialized form of wound treatment involving the use of oxygen.

Over the years Dr. Serena created several affiliated operating companies including Defendant Serena Group, Inc., Serena International, LLC, Oxygen-8, P.C., Serena 6, Serena 7, and October Group. Although these various companies were created, all personnel remained employees of Penn North and Penn North acted as the common paymaster. Testimony at trial indicated that the various companies were either being wound-up or brought under the umbrella of Serena Group, Inc.

Serena International was the company that handled the operations of a wound care ointment that Dr. Serena was attempting to market and distribute. The ointment was called "Suile", and Dr. Serena's venture was backed by an investment group known as Panda Capital.

Dr. Serena's father, E. Anthony Serena, was hired as Penn North's Chief Operating Officer in 2006. Anthony Serena is a former FBI agent and had extensive prior business experience as a Chief Executive Officer of a building company, and later when managing his

own architectural design and building company.   Thereafter, Penn North hired John P. "Jack" Marnoni as Vice-President in August 2006, Marshall Bernstein as Chief Financial Officer in June 2008, and Heather Young Cummings as Corporate Controller in December 2006.

In May 2006, Plaintiff, Joseph Meyers, and Dr. Serena discussed the possibility of Meyers working for Dr. Serena.  At the time of the interview Meyers was unemployed having been discharged from his prior position as Director of Inpatient and Outpatient wound care at Kingsbrook Jewish Medical Center in Brooklyn, New York, when a new Chief Operating Officer was hired.

On July 28, 2006, Dr. Serena hired Meyers as Vice President of Clinical Operations.  His job was to conduct corporate development.  Specifically, Meyers was tasked with finding new leads for wound care centers and developing and opening new wound care and hyperbaric centers in hospitals.  His salary was $135,000 per year, and he was to be reimbursed for his business expenses.

The parties disagree as to the amount of vacation time Meyers was entitled to and whether he was an equity partner with a 20% stake in the business.  There is no written employment agreement.

Meyers contends that he and Dr. Serena entered into an oral contract in which Dr. Serena agreed that Meyers would be a 20% partner in the business and have the same pay and benefits package he had at his former job, including 5 weeks of vacation per year that carried over from year to year.  Dr. Serena contends that he did not promise Meyers he would match his prior employer's pay and benefits package, did not promise him more vacation days than other Penn North employees were entitled to, and did not promise him the right to carry over unused vacation days.  Dr. Serena also contends that he never offered Meyers a partnership interest or

any other type of equity interest in the business, and also notes that Meyers was never asked to invest capital into the business and never did invest any of his own money into the business.

Meyers contends that he and Dr. Serena had two face-to-face meetings to discuss the terms of his employment as well as several telephone conversations before Dr. Serena offered him a job. In contrast, Dr. Serena contends that there was only one face-to-face meeting with Meyers regarding his potential employment. Dr. Serena contends that the meeting took place in Erie, Pennsylvania in May 2006, and that his father, Anthony, also attended.

In June 2008, Meyers job duties and salary changed. He was given the title of National Sales Manager for the Suile ointment and his salary increased to $175,000. The Suile venture failed because the company was never able to generate significant sales of the ointment and eventually Panda Capital, the outside investor, pulled its investment from the venture. Therefore, in early 2009 Meyer was returned to his original salary of $135,000.

There is no dispute that the business was financially struggling during the relevant time periods. Because of the financial difficulties, a decision was made in the Fall of 2008 to withhold paychecks from four employees: Dr. Serena, Anthony Serena, Marshall Bernstein, and Meyers. Four pay checks were withheld from October 2008 through January 2009. The employees agreed to the withholding of their pay for the simple reason that they would be out of a job if they did not. All parties agree that the withheld pay was temporary and would be repaid when the company had the funds. One of the skipped pay periods was repaid, but three were not.

In early June 2009, Meyers was terminated by Anthony Serena. The Serenas contend he was fired at this time because he missed an important meeting that could have otherwise led to a significant contract. In addition, the Serenas contend that Meyers refused to explain why he missed the meeting. Meyers agrees that he missed the meeting, but explains that it was because

he had already met with the lead three previous times and was already scheduled at another meeting. Meyers contends that he was fired for non-job related reasons based on Anthony Serena's personal disagreement with how Meyers conducted his personal life.

In any event, the termination was short-lived as Dr. Serena offered Meyers further employment as a nurse/manager for the wound care center at New York Methodist Hospital in charge of day-to-day operations, and that he would no longer be in sales and development. By memorandum dated July 15, 2009, Dr. Serena set forth Meyers' new job responsibilities, explaining that his current salary and benefits would remain the same. Memo from Serena to Meyers, 7/15/2009, "NY Methodist: New role for Joseph Meyers," Ex. 41, EX. M. Dr. Serena noted that Meyers should be at the center daily "with the exception of 4 weeks of vacation time." Id.

On September 9, 2009, Anthony Serena terminated Meyers for the second and final time, by email, stating as follows:

> Effective immediately your employment with Serena Group and all of its subsidiaries is terminated for cause.

Email from A. Serena to J. Meyers, 9/9/2009, "Termination," Ex. S.

### *Reimbursement Requests for Expenses*

It was Meyers' practice to incur expenses over a lengthy time period and then submit a request for reimbursement for expenses and an estimated mileage amount that covered the time period. In addition, from time to time Penn North would permit Meyers to request funds for past expenses and Penn North would wire Meyers money or issue a check to him when requested. This practice did not involve the submission of a reimbursement request but the funds provided to him were to be counted against expenses that would eventually be formally requested by

Meyers.  Additionally, Meyers was permitted to retain cash co-payments received by the wound care center at the New York Methodist Hospital for his expenses.

Meyers submitted a reimbursement request for expenses and mileage for the time period November 2007 through September 2008.  This request for reimbursement was approved and he was paid.

Meyers also submitted a reimbursement request for expenses and mileage for the time period from September 9, 2008 through December 30, 2008, in the amount of $15,888.93.  After review of the request, Penn North claims that it reimbursed Meyers $14,919.17 of his requested amount, but required further documentation and information from Meyers for the remainder. Meyers claims that Penn North did not include all of his 2008 requested expenses in its system and in fact failed to reimburse him for expenses for 2008 in the amount of $14,919.

Meyers submitted a final request for expenses and mileage for the time period from January 1, 2009 through June 3, 2009, in the amount of $19,771.  Penn North reviewed this request, and declined to reimburse Meyers without further documentation and information from Meyers.  Meyers did not provide further documentation and information as he believed he had already submitted all that was required and Penn North never reimbursed the requested amount.

For requests that were not reimbursed Penn North claims that Meyers failed to adequately document the business purpose of the expenses and provide proper documentation, despite being requested to provide the information several times.  In addition, following a comprehensive review of the requested expenses against the wire transfers, checks, prior reimbursements, and cash co-pays Meyers retained Penn North claims that it actually overpaid Meyers in the amount of $13,579.87 for his 2008 expenses.

At trial testimony was offered by Joseph Meyers, Marshall Bernstein, Heather Young Cummings, Jack Marnoni, Dr. Serena, and Anthony Serena. In addition, we accepted into evidence the deposition testimony of Cynthia Serena, which indicated that she played no role in any of the significant events at issue in this action.

## II.    Discussion

Plaintiff seeks recovery under three related theories: the Pennsylvania Wage Payment and Collection Law ("WPCL"), Breach of Contract, and Promissory Estoppel. In their Counterclaim, Defendants seek reimbursement of $13,579.87, the amount by which Defendants claims it overpaid Plaintiff. The primary focus of the dispute is the employment agreement, that is, the oral contract, between the parties.

Recovery under the statutory provisions of the WPCL is not a separate right to compensation, but rather a vehicle to enforce an already existing right to payment. The Superior Court of Pennsylvania explained the WPCL as follows:

> Pennsylvania enacted the WPCL to provide a vehicle for employees to enforce payment of their wages and compensation held by their employers. The underlying purpose of the WPCL is to remove some of the obstacles employees face in litigation by providing them with a statutory remedy when an employer breaches its contractual obligation to pay wages. The WPCL does not create an employee's substantive right to compensation; rather, it only establishes an employee's right to enforce payment of wages and compensation to which an employee is otherwise entitled by the terms of an agreement. Hartman v. Baker, 2000 PA Super 140, 766 A.2d 347, 352 (Pa.Super. 2000) (citations and quotations omitted).

Thomas Jefferson Univ. v. Wapner, 903 A.2d 565, 574 (Pa. Super. Ct. 2006). "The WPCL is not only a vehicle for recovery of unpaid wages; it also provides for damages in the event an employer withholds compensation in the absence of good faith." Id., citing 43 P.S. § 260.10. "Good faith is not defined in the statute, but it has been determined that any contest or dispute that is based on facts that would lead a reasonable person to find a legitimate dispute as to

whether wages were due, constitutes good faith." <u>Bair v. Purcell</u>, 500 F.Supp.2d 468, 493-94 (M.D.Pa. 2007) (internal quotations and citations omitted). "Additionally, 'an award of attorneys' fees to a prevailing employee in an action brought under the Wage Payment and Collection Law is mandatory,' but the Court retains discretion to determine the amount." Id. at 494 (quoting <u>Oberneder v. Link Computer Corp.</u>, 548 Pa. 201, 696 A.2d 148, 151 (1997) (determining that the statutory language of "shall" in 43 P.S. § 260.9a(f) mandates such payment)).

The issues in this case are straightforward: (1) Did the parties come to an oral employment agreement that included a term awarding Meyers 5 weeks of vacation time that carried over from year to year?; (2) Are Defendants required to reimburse Meyers for pay that he actually earned but that was skipped when the company was financially struggling?; and (3) Did Defendants properly reimburse Meyers for his 2008 and 2009 expenses? Unfortunately both sides to this dispute conducted business in a manner that bordered on careless. If this were a tort case then all parties would be charged with contributory negligence.

Perhaps it was the lack of proper business conduct that caused both sides at trial to follow meandering factual paths involving mostly irrelevant matters that were far from helpful in resolving the issues at hand. For example, much was made of the fact that the Employee Handbook has some provisions that could not possibly apply to an executive, but that in no way means the entire Handbook automatically does not apply to an executive. The testimony on these issues did little to support either sides' position as to whether the parties had an oral agreement on the amount of vacation time Meyers was entitled to. Despite all the testimony concerning the Handbook the only relevant material facts that arose from it are that the Handbook is prima facie evidence that Penn North had a standard policy of awarding employees

2 weeks of vacation time that did not carry over from year to year; and that Meyers was never handed a copy of the handbook, but he was made aware of the existence of the Handbook early in his employment, that it likely applied to him, and that he should have been familiar with the Handbook.

Much time was also wasted on whether original receipts or copies of receipts were required to substantiate expenses when it seemed apparent to the Court that no one required original receipts, and that the testimony regarding this issue was based on a misunderstanding.

Having read the pleadings and heard the testimony at trial we can briefly summarize the parties' positions follows. Meyers claims he was an experienced and valuable potential employee who had substantive relevant knowledge that would assist Penn North in expanding its business and therefore Dr. Serena had every incentive to offer Meyers a pay and benefits package equal to his former employment. Through no fault of Meyers, Penn North was a financially struggling company throughout the time he was employed, and because of that he was not properly paid for three pay periods. In addition, because the company was financially struggling money for expenses was not always timely available. Therefore Meyers would incur expenses over a long period of time without reimbursements. He admits that he did not detail his expenses the way other employees did, but explains that was because as a manager and executive with equity in the business he was not subject to such requirements. Meyers further contends that Penn North accepted Meyers' practice of documenting and submitting his expenses and Penn North's decision to change the requirements for expenses later in his employment was done in order to avoid paying Meyers for expenses he properly incurred, rather than as a bona fide business request.

As for Defendants, Dr. Serena claims he had no incentive to offer Meyers benefits above and beyond any other employee as Meyers was unemployed and in need of a job. For Dr. Serena, Meyers had appropriate experience and potential contacts that might possibly help the business expand into the New York area, therefore Dr. Serena hired him. Penn North was a financially struggling company throughout the time Meyers was employed and was the reason why pay was withheld for some employees in 2008. However, the parties agreed that the earned wages would only be paid back if the business had sufficient funds. Defendants contend that the business never had, and still does not have, sufficient funds to repay the back wages.

Defendants concede that overall they failed to require Meyers to properly submit reimbursement requests for expenses and mileage as they should have, but the company does have documentation to support that Meyers was substantially reimbursed for his properly submitted requested expenses. Defendants also admit that proper documentation and information regarding business purposes of requested expenses was not always required during Meyers' tenure. Defendants maintain that this prior failure does not bar them as a business from later requiring Meyers' to properly substantiate his requested reimbursement expenses for late 2008 and 2009. Defendants claim that they properly denied the reimbursement requests in part for 2008 and the requests in their entirety for 2009, because Meyers never provided the requested information to substantiate his requested expenses.

Having briefly summarized the parties' positions, we will now briefly summarize our conclusions. The parties entered into an at-will employment agreement that Meyers would be paid $135,000 in exchange for his services. The evidence does not support that there was any agreement that Meyers would have vacation time in excess of any other employee of Penn North. Therefore, for the majority of the time he was employed by Penn North he was entitled to two

weeks of vacation that did not carry over. He was entitled to 4 weeks of vacation from when he was appointed to work at New York Methodist Hospital because that is the amount of vacation time New York Methodist Hospital required of all employees. Meyers was terminated for cause and as such he is not entitled to any vacation pay from 2009 as a result of his separation from the company.

Meyers earned wages from Penn North for three pay periods for which he was not paid. Defendants owe him this income. There was no agreement entered into whereby Meyers agreed that he would forever forego payment unless the company had sufficient funds. The business struggled financially but it was not bankrupt and it was able to expand at times and offer significant pay raises to employees and thus a choice could have been made to pay Meyers for wages he actually earned.

While Meyers was entitled to reimbursement for his reasonable business expenses, Penn North is entitled to require that Meyers properly substantiate his expense requests. Meyers failed to do this for much of his requested reimbursements. In addition, the record evidence supports that Penn North has overpaid Meyers $13,579.87 in expenses.

### A. Agreement between the Parties

There was no written agreement between the parties. The parties presented testimony and evidence to establish the terms of their oral agreement. Meyers testified that he entered into an oral agreement with Dr. Serena for a salary of $135,000, with the same benefits Meyers had at his former job. One of the terms Meyers contends the parties agreed to was that Meyers would have 5 weeks of vacation time and that any unused vacation time would carry over from year to year. Finally, Meyers contends that the parties also orally agreed that Meyers would be a 20% equity partner in the business.

Defendants' testimony was that Dr. Serena and Meyers entered into an agreement to ;pay Meyers a salary of $135,000, and there were no other specific terms of the agreement, and no agreement that Meyers was offered an equity interest in the business. Defendants deny that there was an agreement to match Meyers' prior employer's benefits package. It is Defendants' position that Meyers was subject to the standard benefits and terms as other Penn North employees.

We find that the parties entered into an oral agreement to employ Meyers at a salary of $135,000. We further find that Meyers was subject to the same vacation policy as other Penn North employees, as set forth in the Employee Handbook, and that he did not have an equity interest in Penn North or any other related entity.

Penn North and its related businesses were starting to expand when Meyers was hired. The testimony and evidence established that the wound care and hyperbaric centers have always struggled financially and in that sense have always been considered a "start-up" business.

Meyers was a candidate for the job because Dr. Serena wanted to expand the business, that is, to grow the business and obtain more income, and Meyers presumably interviewed for the job because he had the necessary skills and contacts to help a business like Dr. Serena's to expand. A potential employee would want to gain an idea of what plans for growth a start-up business like Dr. Serena's had for the future. Similarly, an employer would want to know how a potential employee would contribute to the growth of the business. Thus, it is likely, and probable, that Meyers and Dr. Serena discussed the potential successful future of the company before Meyers was hired. As part of that discussion the parties may have discussed whether Meyers would gain an equity stake in the business and may have even mentioned that a potential equity stake would be 20%. However, Dr. Serena credibly testified that he never offered Meyers

a partnership interest or any other type of equity interest in the business. Certainly there was nothing in writing on that subject. We agree with Dr. Serena that it would have made no sense to offer a 20% stake in a struggling, start-up business to a new employee who was not offering an investment in the company and had not yet contributed to the expansion of the company.

At best, we can assume that the parties may have had discussions about future rewards dependent on the success of the business, but we actually do not have testimony or evidence to support that assumption. We note that at one point Dr. Serena stated in an email to Meyers that "[w]e will all either be rich or broke." Email from Dr. Serena to Meyers, 6/5/2009, Ex. I. This email was sent late in Meyers' tenure with Penn North, but represents the view that the business was struggling, but still seeking to have a breakthrough expansion that would make the business financially successful. In addition, Jack Marnoni, who has been with Penn North since 2006, described the business as still a "start-up" at the time of trial in 2013, when he explained his responsibilities. He testified that "SerenaGroup is still more or less a startup, so I do what's necessary basically." Tr. 8/15/13, at 47.

The evidence and testimony also support that there was no agreement that Meyers would have vacation time in excess of any other employee of Penn North. Again, there was no written agreement memorializing a 5-week vacation for Meyers. In addition, the Employee Handbook is prima facie evidence that the standard amount of vacation for any Penn North employee with more than a year experience was 2 weeks, and that this vacation did not carry over from year to year. By memo dated January 15, 2007, Meyers was informed by Heather Young that "per the employee handbook" he would be eligible for two weeks of vacation beginning in 2008, up from one week. Memo from Young to Meyers, 7/15/2007, Ex. 2. Meyers' pay statements also indicated that he was subject to 80 hours, or 2 weeks, of vacation time. In addition, Dr. Serena,

Anthony Serena, Heather Cummings, and Jack Marnoni all testified that they were subject to 2 weeks of vacation.

Meyers relied solely on his own testimony to establish that the parties agreed that he would have 5 weeks of vacation time that carried over from year to year. Therefore, at trial he had to rebut the above evidence showing that all other employees were subject to 2 weeks of non-carryover vacation time. This strategy entailed Meyers testifying that he did not believe he was subject to the Employee Handbook because the handbook was never delivered to him or explained to him, and since he was part of management/executive team, as well as an equity owner in the business, the Handbook would not apply to him. Meyers also attempted to show that many provisions of the Employee Handbook contained terms that obviously would not be applicable to someone in his position. Finally, Meyers also testified that when necessary he verbally told Heather Young and Dr. Serena that he was entitled to 5 weeks of vacation, not two.

In the absence of corroborating testimony or evidence to the contrary we conclude that Meyers' testimony and evidence in support of his belief that he was not subject to 2 weeks of vacation time is insufficient to rebut the overwhelming evidence that shows that he was. Accordingly, for the majority of the time he was employed by Penn North he was entitled to two weeks of vacation that did not carry over. We also find that he was entitled to 4 weeks of vacation time from July 2009 until he was terminated in September 2009, in other words, the time period when he was assigned to work at New York Methodist Hospital.

Meyers and Penn North's relationship came to an end when he was terminated for cause on September 11, 2009. Dr. Serena and Anthony Serena credibly testified that the reason for terminating Meyers was because he was deliberately failing to perform his duties, had poor work

attendance, refused to explain his whereabouts for an important meeting he missed, and threatened to report Dr. Serena to the authorities for unnamed allegations.

### B. Vacation Pay

Based on our above discussion finding that Meyers' vacation did not carry over from year to year he is not entitled to vacation pay for unused vacation time in 2008. Meyers testified that he used one week of vacation in 2009. For the first half of 2009 he was subject to two weeks of vacation time. When he was appointed to New York Methodist Hospital he was given 4 weeks of vacation time commensurate with that Hospital's other employees, which prorates to 2 weeks for the latter half of 2009. We find that because Meyers was terminated for cause he is not entitled to vacation pay for unused vacation time in 2009.

### C. Withheld Wages

"'To present a wage-payment claim,' the employee must aver a contractual entitlement 'to compensation from wages' and a failure to pay that compensation." Braun v. Wal-Mart Stores, Inc., 2011 PA Super 121, 24 A.3d 875, 953 (Pa. Super. 2011) (quoting Sullivan v. Chartwell Inv. Partners, LP, 2005 PA Super 124, 873 A.2d 710, 716 (Pa. Super. 2005). Meyers was employed by Penn North and was entitled to be paid his wages. The decision to skip pay periods for certain employees was suggested by Marshall Bernstein and ultimately approved by Dr. Serena. When the decision was implemented to skip pay periods for certain employees due to financial difficulties, Meyers had no viable option but to agree to the plan. He took no part in the decision and no negotiations were held to determine how to handle the missed pay periods. The testimony and evidence established that there was never an agreement among the parties that the skipped pay periods would not be paid. In fact, the plan was to repay the missed pay periods

at some future indeterminate date "when the company had funds." Email from Bernstein to Dr. Serena, A. Serena, and Meyers, 10/22/2008, Ex. 32.

Defendants' arguments as to why they should not be held liable to pay Meyers for the skipped pay periods are not persuasive. First, Penn North argues that Meyers failed to establish the existence of a contract between himself and Penn North regarding repayment of the skipped pay periods. Penn North acknowledges that there was a statement that the skipped wages were to be repaid when the company had funds, but argues that this falls short of being an enforceable condition. Moreover, Penn North argues that to the extent that it is considered a promise, it is unenforceable because it is too vague and indefinite since it lacks detail as to time and manner of performance.

The first problem with Penn North's argument is that it places focus on the existence of a contract for repayment of skipped pay periods, when the focus should be on the employment contract between Penn North and Meyers that Penn North would pay its employee for the hours he worked. It is undisputed that Meyers earned the wages for the three pay periods that were skipped. Another problem with this argument is Penn North's disavowal of its obligation to pay an employee who had earned wages. While acknowledging that Meyers was told the skipped pay periods would be repaid, Penn North now self-servingly characterizes its promise to repay as vague and indefinite. Finally, the record evidence shows that Dr. Serena affirmed at least twice that he had always intended to repay Meyers for the skipped pay periods.

Penn North's alternative argument takes the opposite position and assumes that there is an enforceable contract regarding the repayment of the skipped pay periods, but Penn North does not mean the original obligation to pay Meyers for wages he earned under the oral employment contract. Instead Penn North points to a separate agreement between the parties that, in Penn

North's view, does contain an enforceable condition precedent before wages would be repaid: that the company first has sufficient funds. Penn North concludes that it has established that the company never had sufficient funds to repay the wages. Thus, Penn North argues that since the condition precedent was not satisfied Meyers cannot succeed on this claim.

There are two flaws with this argument. The evidence does not establish that there was an agreement among the parties that contained such a condition. In essence, Meyers was told that his pay was going to be skipped and if he did not agree he would be out of job. We cannot say that Meyers entered into a voluntary binding agreement the terms of which were "agree to forego your earned wages in exchange for keeping your job, with the condition that the unpaid wages will only be paid back when the company determines in its sole discretion that it has sufficient funds to pay you back." To state the terms of the alleged agreement reveals that it is a one-sided agreement that vests sole discretion in one party to determine when the vague condition of "the company having funds" is met. Moreover the testimony and evidence establish that in any case Meyers never agreed to such an open-ended and indeterminate condition to receiving his earned wages. In addition the evidence and testimony also support Meyers' position that he continually and consistently requested to be paid for the skipped pay periods.

We also discount Defendants argument that the company did not actually have sufficient funds to repay the missed pay. Although the business was financially struggling, it was financially struggling at other times too, both before and after the skipped pay periods occurred. During those time periods Penn North was able to pay wages to all its employees. Moreover, we find that the continuing decision to not repay the skipped periods was one choice among many made by Dr. Serena and Anthony Serena. The evidence shows that the business did hire new employees, expand the business, pay its liabilities, and even increase salary for some employees.

These executive decisions again show that to the extent there was a condition precedent of the company having "sufficient funds" to repay the skipped pay periods, the condition was so vague and indefinite that it is conceivable that as long as the executives chose to spend money in other areas Penn North would never have "sufficient funds" to repay Meyers.

Defendants rely in part on the fact that neither Dr. Serena nor Anthony Serena have ever been repaid for the missed pay periods. This is weak support given the fact that Dr. Serena owns the business, and Anthony Serena, his father, has consistently earned a substantial salary. While their fortunes are tied to the success of the business, neither one of them are otherwise in danger of losing their jobs. In addition, the evidence supports the conclusion that Dr. Serena, in consultation with his father, retain complete control over their wages and return on investment.

Finally, Penn North cites to <u>Molinaro v. Akrion, Inc.</u>, 2010 Pa. Dist. & Cnty. Dec. LEXIS 335 (Pa. County Ct. 2010), for the proposition that an "officer of the company cannot be found individually liable under the WPCL for salary deferrals and reductions expressly agreed to and initiated by a plaintiff." Defendants' Proposed Findings of Fact and Conclusions of Law, at 26, ¶12; Defendants' Reply 11. Penn North does not expand on this statement and a review of the case reveals that it is not in favor of Penn North. The plaintiff in Molinaro suing for back wages was the former Chief Executive Officer of the company. However, it was Molinaro himself, as the CEO, who made the decision to reduce his salaries and it was Molinaro who actually implemented the decision. <u>Molinaro</u>, 2010 Pa. Dist. & Cnty. Dec. LEXIS 335, *16. The defendants in that case were not the decision-makers with respect to the income reductions and the defendants did not require the plaintiffs to reduce their salaries. <u>Id.</u> Obviously this case is distinguishable since Meyers did not initiate, authorize, or implement the plan to skip pay periods, and Penn North did require that Meyers forego receiving his wages. Liability can be

imposed on Dr. Serena as he did authorize the skipped pay periods and he was actively involved in corporate policy-making and decision-making, including decisions on matters of pay and compensation.

Accordingly, we find that there was an enforceable contract between Penn North and Meyers for the payment of wages, Penn North has breached that contract by failing to pay Meyers for wages that he has earned, and thus Penn North owes Meyers his unpaid wages for three pay periods at $6,730.77 per pay period. Thus, Penn North owes Meyers $20,193.31 in unpaid earned wages.

We can also view this issue in another way; even if there were no contract, we could invoke the ancient doctrine of *quantum meruit* – he worked; he is entitled to be compensated for his work.

Penn North argues that even if Meyers establishes a breach of contract for the missed pay periods he cannot state a claim under the WPCL because there was no definitive date on which Meyers' wages "would otherwise be due and payable" by Penn North. Defendants' PFF and CL, 36, ¶ 69; Penn North's Reply, at 5, quoting 43 P.S. § 260.5(a). We find that this argument erroneously focuses on Bernstein's statement the skipped wages would be repaid when the company had sufficient funds, when the focus should be on the contract between the employer and employee for when the wages were paid. Here, wages were paid every two weeks. We find that the latest possible date that Meyers' skipped wages were "otherwise due and payable" was the next pay period after Meyers was terminated from his employment. See 43P.S. § 260.5(a) ("whenever an employer separates an employee from the payroll . . . the wages . . . earned shall become due and payable not later than the next regular payday of his employer on which such wages would otherwise be due and payable").

We turn now to address whether Meyers is entitled to liquidated damages under the WPCL. An employee may be entitled to additional, liquidated damages pursuant to the WPCL, which provides as follows:

> Where wages remain unpaid for thirty days beyond the regularly scheduled payday, or, in the case where no regularly scheduled payday is applicable, for sixty days beyond the filing by the employe[e] of a proper claim or for sixty days beyond the date of the agreement, award or other act making wages payable …and no good faith contest or dispute of any wage claim including the good faith assertion of a right of set-off or counter-claim exists accounting for such non-payment, the employe[e] shall be entitled to claim, in addition, as liquidated damages an amount equal to twenty-five percent (25%) of the total amount of wages due, or five hundred dollars ($500), whichever is greater.

43 P.S. § 260.10. Having made the determination that Meyers' wages have remain unpaid, there is no dispute between the parties the section 260.10 is applicable. However, Penn North argues that Meyers is not entitled to liquidated damages because Penn North set forth a good faith contest and dispute of whether the wage claim was payable. Defendants' Proposed Findings of Fact and Conclusions of Law 36, ¶ 70. Neither side expands on its argument regarding the "good faith" dispute, and instead relies on their respective arguments concerning the disputed wage claim itself. The burden of establishing good faith rests with the employer. Wapner, 903 A.2d at 575 ("It is both logical and appropriate to allocate to the employer the burden of proving good faith" and "party in possession of the evidence to establish its good faith has the burden of proof").

As we understand Penn North's argument, the decision to contest or dispute Meyers' claim for unpaid wages rests on Penn North's position that the skipped pay periods would only be paid back when the company had sufficient funds, and Penn North introduced evidence to establish that it never had sufficient funds. As noted above, although Penn North was financially struggling its decision not to pay Meyers the earned wages that were skipped was one decision of

many it could have made with respect to its finances. We cannot say that Penn North has established that its decision was based on a good faith dispute since, as we have explained, the decision as to when the company had sufficient funds to repay Meyers was vague enough that Penn North was able to interpret it to mean that they could expend funds to expand the business, increase salaries, and pay its liabilities, but still not have reached "sufficient" funds to repay Meyers. No testimony or evidence was introduced by Penn North to establish that it was actually financially unable to repay Meyers, or that its decision to expend money in other directions through expansion, paying its other liabilities, and increasing salary of other employees, was consistent with the condition of not having sufficient funds to repay Meyers.

In addition, Penn North relies on statements made by Dr. Serena in which he promised Meyers that he would be repaid for the skipped pay periods, but only if funding was available. Specifically, in his memo to Meyers concerning Meyers' new role with the company, Dr. Serena stated

> In regards to the payments which executives voluntary agreed to forego last year, we are willing to reimburse you for lost income, particularly in light of the fact that you now moving from the executive team to the clinical area. However, *there are several conditions which must be first met prior to your receiving payment*. First and foremost *the NY Methodist wound and hyperbaric center must have reached a point at which it is profitable (for Serena Group) and the monies I invested and signed for personally have been repaid.* I suspect that this will take at least one year from the time of the initial operation. The monies will be paid to you as bonus with appropriate taxes withheld, I cannot commit to a time frame for payment at this time. I believe this is more than fair.

Memo from Serena to Meyers, 7/15/2009, Ex. 41, Ex. M (emphasis added). On September 4, 2009, Dr. Serena stated in an email to Meyers, as follows:

> I have NEVER said that you would not be paid appropriate expenses or back pay. However *prior to making these payments I need to get the income stream from NY flowing.* I am sure you understand.

Email from Dr. Serena to Meyers, 9/5/2009, Ex. Q (emphasis added).

Penn North's position is that Meyers had failed in his duties because he did not produce as expected during his tenure with the company. Specifically, Penn North explains that Meyers was able to assist in successfully developing and opening a new center only in one location, and he was failing in his duties to make the center at New York Methodist Hospital successful and profitable. Thus, it is logical that Penn North would view Meyers' failure as a contributing factor to company's financial difficulties. It is also logical that Penn North would deem it reasonable to delay repaying Meyers' back wages until the New York wound care center he was responsible for was profitable enough to fund Meyers' repayment.

Although we can certainly see the logic of Penn North's position, there is simply no evidence to show that Meyers ever agreed to the conditions cited by Penn North when he agreed to skip the pay periods in 2008. Moreover, in the above documents Dr. Serena is attempting to impose completely new conditions on Penn North's obligation to repay the wages; conditions that were never addressed in 2008. Dr. Serena's new conditions are much narrower than the vague promise that repayment would occur when the company had funds. Now, Dr. Serena conditions repayment on (1) when a specific wound care center becomes profitable, and (2) only after Dr. Serena has been reimbursed for his personal investments into the company. Thus, we conclude that Penn North's position was logical and made sense for the business, but it was not done in a good faith dispute over repayment of wages that were already earned. Accordingly, Meyers is entitled to liquidated damages under the WPCL at twenty-five percent (25%) of the total amount of wages due, which amounts to 25% of $20,192.31, or $5,048.07. Defendants thus owe Meyers a total amount of $25,240.38 in unpaid wages and liquidated damages.

In addition, an award of attorney's fees to a prevailing employee is also authorized under the WPCL. "The court in any action brought under this section shall, in addition to any

judgment awarded to the plaintiff or plaintiffs, allow costs for reasonable attorneys' fees of any nature to be paid by the defendant." 43 P.S. § 260.9(f). Thus we will order Plaintiff to file a petition for "costs for reasonable attorneys' fees" based on the award under the WPCL. We retain the discretion to determine the appropriate amount of the fee award. Signora v. Liberty Travel, Inc., 886 A.2d 284, 292 (Pa. Super. 2005) (citing Oberneder, 548 Pa. 201, 696 A.2d 148).

### D.  Expenses for 2008 and 2009

By the time the parties were bickering over expenses the enmity between them was so great that neither side was willing to cooperate with the other. Penn North's position was to not provide any reimbursement at all unless it received additional information, and Meyers' position was that he wanted all his requested expenses reimbursed based on his submissions since it was the same type of information he had given - and been reimbursed for - in the past. Each side's "winner take all" approach to the expenses continued into trial leaving a final decision for the Court.  We decline to review Meyers' expense requests on a line by line basis to determine whether a specific reimbursement request was proper and whether Penn North should have paid it.

The record evidence convincingly demonstrated that Penn North substantiated Meyers' requested expenses for 2008 and 2009, and Penn North substantiated its disbursements to Meyers in the form of checks, wire transfers, and cash copays retained by Meyers. Meyers has not successfully rebutted the evidence showing that he was overpaid $13,579.87 in reimbursement expenses by Penn North. Accordingly we find that Penn North has reimbursed Meyers for his expenses for 2008.

Meyers total request for expenses in 2009 is $19,771. Understandably an executive decision was made to adhere to fairly strict requirements before reimbursing Meyers' request for 2009. By then, Penn North was aware that it had substantially over-reimbursed Meyers for expenses requested to the end of 2008, and a detailed review of Meyers' submissions likely alerted Penn North that it had been a mistake to have blindly reimbursed Meyers in the past. Penn North disallowed $7,313,06 of the requested expenses and would not reimburse the remaining $12,368.80 without further information from Meyers to substantiate the business purpose of the requested expenses.

We find no fault with Penn North choosing to correct its past method of reimbursement and to require that Meyers substantiate his requested expenses in 2009. The agreement between the parties to reimburse expenses can only be viewed as an agreement to reimburse reasonable, business-related expenses. Meyers cannot rely on Penn North's prior blanket approval of past requested expenses to demand that Penn North again blindly reimburse him for expenses. Therefore, it was incumbent on Meyers to comply with Penn North's legitimate request to substantiate his expenses. Meyers never did. Without appropriate substantiation of the legitimate business purpose for the 2009 expenses requested by Meyers we find that Penn North is not obligated to reimburse Meyers for such expenses.

Because of our determination that Penn North does not owe Meyers for any past expenses we further conclude that Meyers owes Penn North the $13,579.87 Penn North overpaid Meyers. This amount will be used as an offset of the award of back wages to Meyers.

## IV. Conclusion

As discussed above, both sides in this dispute were at fault in the manner that they conducted business with one another. In addition, it was clear that there was increasing mistrust

and enmity between the parties throughout Meyers' employment. As we have mentioned at trial both sides staked out extreme, diametrically opposed positions as to each of the disputed issues leaving to the Court to resolve the dispute. As set forth above, we conclude that the parties entered into an oral employment agreement. Under this agreement Meyers' vacation time did not carry over from year to year and because he was properly terminated for cause he is not entitled to vacation pay for unused vacation. However, Meyers is entitled to wages he earned but were not paid by Defendants, along with liquidated damages. Finally, we determine that Penn North properly declined to reimburse Meyers for his 2009 reimbursement expenses, and that Penn North is entitled to repayment of expenses it reimbursed to Meyers over and above the amount it authorized. An appropriate Order will be entered.

Date: _March 28 2014_          _Maurice B. Cohill Jr._
                               Maurice B. Cohill, Jr.
                               Senior United States District Court Judge